B1040 (FORM 1040) (12/15)

| **ADVERSARY PROCEEDING COVER SHEET** (Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER** (Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>First Fruits Business Ministry, LLC, First Fruits Beverage Company, LLC, Roger J. Catarino | **DEFENDANTS**<br>Imagenetix, Inc. |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Derik J. Roy III<br>ROYLAW, APLC<br>17111 Beach Blvd., Suite 204<br>Huntington Beach, CA 92647 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☑ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☑ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Plaintiffs seek declaratory and injunctive relief against Defendant due to Defendant's repeated attempts to wrongfully convey intellectual property belonging to Plaintiffs as part of Defendant's Chapter 11 proceeding.

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11 - Recovery of money/property - § 542 turnover of property
- ☐ 12 - Recovery of money/property - § 547 preference
- ☑ 13 - Recovery of money/property - § 548 fraudulent transfer
- ☐ 14 - Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21 - Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31 - Approval of sale of property of estate and of co-owner - § 363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41 - Objection / revocation of discharge - § 727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51 - Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66 - Dischargeability - § 523(a)(1),(14),(14A) priority tax claims
- ☐ 62 - Dischargeability - § 523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67 - Dischargeability - § 523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61 - Dischargeability - § 523(a)(5), domestic support
- ☐ 68 - Dischargeability - § 523(a)(6), willful and malicious injury
- ☐ 63 - Dischargeability - § 523(a)(8), student loan
- ☐ 64 - Dischargeability - § 523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65 - Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71 - Injunctive relief - reinstatement of stay
- ☑ 72 - Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81 - Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91 - Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01 - Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§ 78aaa *et.seq.*
- ☐ 02 - Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| | |
|---|---|
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ 10,000,000.00 |
| Other Relief Sought | |

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Imagenetix, Inc. | | BANKRUPTCY CASE NO.<br>12-16423 MM11 |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of California | DIVISIONAL OFFICE | NAME OF JUDGE<br>Margaret M. Mann |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature**. This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Derik J. Roy, III, SBN 264052
droy@roylaw.com
**ROYLAW, APLC**
17111 Beach Blvd., Suite 204
Huntington Beach, CA 92647
Telephone: (714) 841-1111
Facsimile: (714) 841-1112

Attorney for FIRST FRUITS BUSINESS MINISTRY LLC, FIRST FRUITS BEVERAGE COMPANY LLC, and ROGER J. CATARINO

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re:<br><br>IMAGENETIX, INC., a Nevada corporation,<br><br>Debtor. | Case No. 12-16423 MM11<br><br>Chapter 11<br><br>Hon. Margaret M. Mann<br><br>**Adv. No.** _______________ |
| FIRST FRUITS BUSINESS MINISTRY LLC, a South Carolina limited liability corporation, FIRST FRUITS BEVERAGE COMPANY LLC, a Delaware limited liability corporation and ROGER J. CATARINO, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>IMAGENETIX, INC., a Nevada Corporation,<br><br>Defendant. | |

Plaintiffs First Fruits Business Ministry, LLC, First Fruits Beverage Company, LLC and Roger J. Catarino (hereinafter collectively referred to as "First Fruits") hereby allege as follows:

## NATURE OF THE ACTION

1. This is an adversary proceeding by First Fruits against Defendant Imagenetix, Inc. (hereinafter "Imagenetix") for damages and injunctive relief.

## JURISDICTION AND VENUE

2. This Court maintains jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and Federal Rule of Bankruptcy Procedure 7003, as this proceeding arises under and is related to the Chapter 11 case *In re: Imagenetix, Inc.,* Case No. 12-16423 MM11, which is currently pending before this Court.

3. This Court has personal jurisdiction over Imagenetix pursuant to Federal Rule of Bankruptcy Procedure 7004(f).

4. Venue is proper pursuant to 28 U.S. Code § 1409.

## THE PARTIES AND RELATED ENTITIES

5. Plaintiff First Fruits Business Ministry, LLC is a South Carolina limited liability corporation.

6. Plaintiff First Fruits Beverage Company, LLC is a Delaware limited liability corporation.

7. Plaintiff Roger J. Catarino is an individual residing in South Carolina.

8. Defendant Imagenetix is a Nevada corporation.

## BACKGROUND

9. On September 2, 2005, Imagenetix entered into an Exclusive Patent License Agreement (hereinafter "EPLA," **Exhibit "A"**) with the University of Minnesota (hereinafter

"UMinn") so that Imagenetix could acquire exclusive use of the United States Patent No. 6,899,892 (hereinafter "892 Patent"), which UMinn invented and owned at the time. Section 8.1.2. of the EPLA contained a termination provision whereby UMinn possessed the option to terminate the agreement in its entirety in the event that Imagenetix "voluntarily or has filed against it a petition under applicable bankruptcy or insolvency laws that the company fails to have released after thirty (30) days of filing." **(P. 9, Exhibit "A")**.

10. Imagenetix entered into an exclusive marketing and supply agreement for the 892 Patent with TriPharma, LLC (hereinafter "TriPharma") on June 27, 2006, and subsequently amended this agreement on October 1, 2007. Section 3 of this Amended and Restated Exclusive Marketing and Supply Agreement (hereinafter "AEMA") stated that the AEMA between Imagenetix and TriPharma was to remain in effect until October 1, 2012, at which time the agreement would renew for an additional five year period, unless either party had provided notice of termination.

11. As a result of a subsequent dispute between Imagenetix and TriPharma regarding the many agreements between the parties, Imagenetix terminated the AEMA on June 3, 2010.

12. On August 23, 2010, First Fruits entered into a Patent License Agreement with TriPharma to acquire a sublicense with respect to the 892 Patent. At the time this agreement was executed, TriPharma failed to inform First Fruits of its dispute with Imagenetix, or of the fact that Imagenetix had terminated the AEMA earlier that year.

13. In late 2010, First Fruits discovered that the AEMA had been cancelled prior to its sublicense agreement with TriPharma, and as a result, First Fruits became greatly concerned about its 892 Patent rights. First Fruits also learned that Imagenetix possessed an exclusive right to purchase the 892 Patent under the EPLA with UMinn.

14. In early 2011, due to its desire to produce a "weight loss water" beverage product, First Fruits negotiated an agreement whereby Imagenetix would purchase the 892 Patent from UMinn, and subsequently assign the 892 Patent to First Fruits.

15. On March 3, 2011, First Fruits and Imagenetix executed an Agreement for Assignment of Patent and Other Property (hereinafter "AAPO," **Exhibit "B"**). Under the AAPO, for a purchase price of $2,500,000.00, First Fruits acquired all rights to the 892 Patent and related intellectual property, including all rights to any formulations of the fat and weight loss product that was the subject of a controlled clinical trial at the University of Connecticut (hereinafter "UConn product").

16. The AAPO was supplemented on March 4, 2011 to also provide First Fruits with a non-exclusive license to the Trisynex trademark for the purpose of manufacturing, marketing and selling weight loss beverage products. The only limitations to the AAPO were that Imagenetix would retain an exclusive license for the limited purpose of manufacturing, marketing and selling UConn Product in capsule form and UConn Product intended for use by animals only **(P. 3-4, Exhibit "B")**.

17. Due to the dispute that had arisen between Imagenetix and sublicensee TriPharma regarding the 892 Patent, the AAPO was also subject to the outcome of *Imagenetix, Inc. v. Tripharma, LLC, et al.*, JAMS Arbitration Case No. 1240020032, (hereinafter "arbitration.") This arbitration was lengthy and included 12 days of hearings, numerous witnesses, and extensive review of evidence by the arbiter.

18. On November 2, 2011, TriPharma prevailed in the arbitration over Imagenetix, resulting in the arbiter ordering the reinstatement of the AEMA, which had previously been terminated by Imagenetix. During the course of this extensive arbitration, the arbiter carefully

considered the AEMA and each and every clause therein, including the highly important renewal clause, and chose to extend its term by a fixed term of two years, to October 1, 2014, for the sole purpose of affording TriPharma additional time to "exploit the benefits of the agreement," rather than limit it to a one year window.

19. Due to the fact that the AAPO was subject to the outcome of the arbitration, at the request of TriPharma, the United States District Court, Central District of California, in *TriPharma v. First Fruits, LLC, et al.*, Case No. SACV12-00404-JVS (Anx), subsequently issued a temporary injunction also enjoining First Fruits from the sale, distribution or advertising of any 892 Patent product until the AEMA between TriPharma and Imagenetix expired on October 1, 2014.

20. On December 17, 2012, Imagenetix filed the present Chapter 11 petition. Upon learning of the Imagenetix bankruptcy, First Fruits issued a written notice of termination of Imagenetix's 892 Patent license rights on May 31, 2013 **(Exhibit "C")**, a power it retained as assignee of the EPLA **(P. 9, Exhibit "A")**.

21. Despite the fact that under the AAPO with First Fruits, Imagenetix possessed only a license to produce UConn product in capsule form and for consumption by animals only, as well as the fact that even that limited license had been properly terminated by 892 Patent owner First Fruits upon Imagenetix's Chapter 11 filing, Imagenetix nonetheless entered into a Settlement and Release Agreement (hereinafter "Settlement Agreement") with TriPharma on August 29, 2013, which purported to extend TriPharma's exclusive sublicense under the AEMA in perpetuity, based on the AEMA's renewal option.

22. On October 30, 2014, TriPharma filed an Ex Parte Application for Permanent Injunction under Case No. SACV12-00404-JVS seeking to permanently extend its rights based

both upon the Settlement Agreement, as well as the argument that the arbiter's ruling had, despite its plain and clear language to the contrary, actually intended to grant TriPharma a perpetual, exclusive sublicense to the 892 Patent.

23. The Court, on December 8, 2014 **(Exhibit "D")** rejected these arguments, stating that "[t]he Settlement Agreement purports to define TriPharma's rights after [October 1, 2014], but if Imagenetix had no rights to convey, any purported transfer to TriPharma was ineffective." **(Exhibit "D" P. 4)** The Court accordingly denied TriPharma's application, stating that the "Permanent Injunction and extensions thereof have expired and are no longer in force." **(Exhibit "D" P. 5**).

24. Despite this ruling, on February 18, 2016, Imagenetix again sought to transfer 892 Patent rights to TriPharma under an Amended Imagenetix/TriPharma Settlement Agreement (hereinafter "Amended Settlement Agreement") in its bankruptcy proceeding before this Court.

25. Section 5 of the Amended Settlement Agreement, titled "Transfer of the Rights Under the Imagenetix/TriPharma Settlement Agreement as to the '892 Patent" stated in part: "Imagenetix hereby confirms and acknowledges that as of November 4, 2013, TriPharma's exclusive right to the '892 Patent, the continued validity of the Imagenetix/TriPharma Settlement Agreement, and that said rights presently exist and are hereby transferred to TriPharma, and not withstanding its ownership of the Patent, which it acquired from Imagenetix, the First Fruits Beverage Company, First Fruits Business Ministry and Roger Catarino ("First Fruits Parties") held no license or rights to market, sell or distribute any products covered by the Patent '892 and the First Fruits Parties purchased the patent in full knowledge of and subject to the rights of TriPharma." Section 6 of the Amended Settlement

Agreement then sought to transfer Imagenetix's purported rights to the 892 Patent to TriPharma for a sum of $1,000,000.

26. The motion to approve the Amended Settlement Agreement was subsequently denied by this Court on May 10, 2016.

27. On July 18, 2016, First Fruits brought Adversary Proceeding No. 16-90121-MM in Imagenetix's above-referenced bankruptcy, seeking damages, injunctive, and declaratory relief against Imagenetix based upon their attempts to transfer the 892 Patent and related intellectual property to TriPharma via the Amended Settlement Agreement.

28. On or about January 9, 2017, First Fruits learned that Imagenetix testified that it does not claim ownership of the 892 Patent and related intellectual property, and that the 892 Patent and related intellectual property are not property of the bankruptcy estate. (**Exhibit "E"**). Due to this, First Fruits stipulated to dismissal of the Adversary Proceeding.

29. Shortly thereafter, First Fruits learned that while Imagenetix does not claim actual ownership of the 892 Patent, it instead, under its Schedule G – Executory Contracts and Unexpired Leases, purports to own and seeks to transfer to TriPharma, an exclusive and perpetual license to the 892 Patent, again completely ignoring the December 8, 2014 ruling, as well as the May 31, 2013 Notice of Termination of Imagenetix's license.

**COUNT ONE – FRAUDULENT CONVEYANCE [11 U.S. Code § 548]**

(By ALL Plaintiffs against ALL Defendants)

30. Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 through 29, inclusive, as though fully set forth herein.

31. On December 17, 2012, Imagenetix filed the present Chapter 11 petition. Upon learning of the Imagenetix bankruptcy, First Fruits issued a written notice of termination of

Imagenetix's 892 Patent license rights on May 31, 2013, a power it retained as assignee of the EPLA.

32. On August 29, 2013, despite the fact that Imagenetix had received actual notice that it no longer possessed any rights to the 892 Patent, Imagenetix nonetheless entered into a Settlement Agreement with TriPharma which purported to transfer TriPharma a perpetual and exclusive sublicense to the 892 Patent.

33. Imagenetix made such transfer with actual intent to defraud entities to which it was indebted on or after the date of the purported transfer.

34. On February 18, 2016, Imagenetix again purported to transfer 892 Patent rights to TriPharma under an Amended Settlement Agreement in its bankruptcy proceeding before this Court for a sum of $1,000,000. As part of this Amended Settlement Agreement, Imagenetix knowingly and falsely stated that "Imagenetix hereby confirms and acknowledges that as of November 4, 2013, TriPharma's exclusive right to the '892 Patent, the continued validity of the Imagenetix/TriPharma Settlement Agreement, and that said rights presently exist and are hereby transferred to TriPharma, and not withstanding its ownership of the Patent, which it acquired from Imagenetix, the First Fruits Beverage Company, First Fruits Business Ministry and Roger Catarino ("First Fruits Parties") held no license or rights to market, sell or distribute any products covered by the Patent '892 and the First Fruits Parties purchased the patent in full knowledge of and subject to the rights of TriPharma." At present, under its Schedule G – Executory Contracts and Unexpired Leases, Imagenetix continues to seek to transfer to TriPharma an exclusive and perpetual license to the 892 Patent, again completely ignoring the the May 31, 2013 Notice of Termination of Imagenetix's license.

35. Imagenetix made such transfer with actual intent to defraud entities to which it was indebted on or after the date of the purported transfer.

36. As a result of the fraudulent conveyances by Imagenetix, First Fruits has suffered significant damages, including, but not limited to, the inability to fully engage in commercial transactions and business with respect to the 892 Patent and its related products, and ongoing and extensive legal fees and costs according to proof at trial, but at least in excess of $10,000,000.00.

37. The aforementioned conduct of Defendants, described in this Complaint, all of which is incorporated herein by reference, was intended by Defendants to cause injury to Plaintiffs or was despicable conduct carried on by Defendants with a willful and conscious reckless disregard of Plaintiffs' rights, subjecting Plaintiffs to unjust hardship in conscious disregard of their rights, and was conducted with the intention to deprive Plaintiffs of property, legal rights or otherwise cause injury, such as to constitute malice, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

## COUNT TWO – INJUNCTIVE RELIEF

**(By ALL Plaintiffs against ALL Defendants)**

38. Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 through 37, inclusive, as though fully set forth herein.

39. By reason of the misconduct by Imagenetix described herein, First Fruits, as owners of the 892 Patent, are entitled to a preliminary and permanent injunction prohibiting and enjoining Imagenetix from any further attempts to convey or transfer the 892 Patent to which Imagenetix holds no ownership or license.

40. Should Imagenetix be permitted to transfer away property belonging to First Fruits, to which Imagenetix does not hold any ownership or license, it would cause First Fruits irreparable harm far outweighing any detriment suffered by Imagenetix as a result of an injunction, and would run contrary to the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief as follows:

1. For compensatory damages;
2. For punitive damages;
3. For injunctive relief;
4. For attorney's fees herein incurred;
5. For costs of suit herein incurred;
6. For such other and further relief as the Court may deem proper.

Dated: March 13, 2017

**ROYLAW, APLC**

Derik J. Roy, III, Esq.
Attorney for First Fruits Beverage Company, LLC, First Fruits Business Ministry, LLC, and Roger J. Catarino

# EXHIBIT "A"

Shaded Area - Internal University Use Only
PTM Agreement No.: ______
PTM Docket No(s): Z01153

# UNIVERSITY OF MINNESOTA

## EXCLUSIVE PATENT LICENSE AGREEMENT

**THIS AGREEMENT** is dated and effective as of the date of last signature (the "Effective Date"), and is made by and between Regents of the University of Minnesota, a constitutional corporation under the laws of the state of Minnesota (the "University"), and Imagenetix, a corporation, under the laws of the state of Nevada (the "Company").

### Purpose

The University owns the right to license to others certain rights to the Licensed Patent(s), as that term is defined and used in this Agreement. The Company desires that the University grant it a license to use, develop, and commercialize the inventions claimed in the Licensed Patents. The University is willing to grant such a license on the terms set forth below.

**NOW, THEREFORE,** the parties agree that:

1. **Definitions.** For purposes of interpreting this Agreement, the following terms shall have the meanings ascribed to them below in this article:

1.1. "Event of Force Majeure" means an unforeseeable act that wholly prevents a party from performing one or more of its material duties under this Agreement and that was outside of the reasonable control of the party. An Event of Force Majeure includes acts of war or of God, insurrection and riot, and labor strikes. An Event of Force Majeure shall not mean a party's inability to obtain a third party's consent to any act or omission.

1.2. "Field of Use" means the field(s) of use described in section 3(a) of attached Exhibit A.

1.3. "Net Sales Price" means the gross amount invoiced for sales, leases, and other dispositions of Licensed Products less (i) all trade, quantity, and cash discounts actually allowed, (ii) all credits and allowances actually granted due to rejections, returns, billing errors, and retroactive price reductions, (iii) duties, and (iv) excise, sale and use taxes, and equivalent taxes. In the event the Company or a sublicensee, as the case may be, sells, leases, or disposes of a Licensed Product (i) to a third party that owns fifty percent (50%) or more of the voting capital stock, or like equity security, of the Company or the sublicensee, as the case may be, or (ii) to a third party in which the Company or a sublicensee, as the case may be, owns fifty percent (50%) or more of the voting capital stock, or like equity security (such third party is hereinafter referred to as an "Affiliate"), the "Net Sales Price" for that transaction for purposes of this Agreement



Filename - exclusive license final.doc
Document last saved 9/8/03

shall be equal to the price the Company or the sublicensee, as the case may be, charges non-Affiliate third parties for the Licensed Product or if the Company or the sublicensee does not offer to sell the Licensed Product to the public, the price charged by the Company or the sublicensee for a product of similar kind, quality, and quantity.

1.4. "Licensed Patent" means the patent(s) described in section 2(a) of attached Exhibit A along with any valid and subsisting patent issued during the term of this Agreement by the United States Patent and Trademark Office or any like foreign body with respect to a Patent Application. The term "Licensed Patent" also means any reissues or reexaminations of a Licensed Patent.

1.5. "Licensed Product" means any product or good in the Field of Use that is made by, made for, sold, transferred, or otherwise disposed of by the Company or its sublicensees during the term of this Agreement and the Post-termination Period and that, but for the granting of the rights set forth in this Agreement, would infringe (including under the doctrine of equivalents) one or more claims in a Licensed Patent or Patent Application, or any product or good that is made using a process or machine that is covered by a claim in a Licensed Patent or Patent Application. The term "Licensed Product" also means any service provided by or for the Company or its sublicensees that incorporates all or any portion of a product that would be a Licensed Product. Unless the parties otherwise agree in writing, the term, Licensed Product refers only to products and goods manufactured, made, sold, transferred, or otherwise disposed of during the term of this Agreement.

1.6. "Licensed Technology" means collectively the inventions claimed in each Licensed Patent and each Patent Application.

1.7. "Patent Application" means the patent application(s) described in section 2(b) of attached Exhibit A. The term "Patent Application" also means any continuations, continuations-in-part, and divisions of a Patent Application.

1.8. "Payment" means a payment to be made by the Company to the University specified in section 6.1 of this Agreement and described in section 6 of attached Exhibit A.

1.9. "Performance Milestone" means an act or event specified in section 5.1 of this Agreement and described in section 7 of attached Exhibit A.

1.10. "Post-termination Period" means the one hundred eighty (180)-day period commencing on the date of termination or expiration of this Agreement.

1.11. "Territory" means the geographical area described in section 3(b) of attached Exhibit A.

2. Term. The term of this Agreement shall commence on the Effective Date and, unless terminated earlier as provided below in article 8, this Agreement shall expire on the date on which both no Licensed Patent is valid and subsisting in any country in the Territory and no Patent Application is pending in any such country.

3. Grant of License.

3.1. The Company's Rights.

3.1.1. Subject to the terms and conditions of this Agreement, the University hereby grants to the Company, and the Company hereby accepts, an exclusive license to make (including to have made on its behalf), use, offer to sell or sell, offer to lease or lease, import, or otherwise offer to dispose or dispose of Licensed Products in the Territory. The parties acknowledge and agree that the license granted in this Agreement shall be limited to the inventions in the Field of Use that are expressly claimed in each Licensed Patent and expressly claimed and allowed in each Patent Application. No provision of this Agreement shall be construed to grant the Company, by implication, estoppel or otherwise, any rights other than the rights expressly granted it in this Agreement to the Licensed Technology, a Licensed Patent or Patent Application, or to any other University-owned technology, patent applications, or patents.

3.1.2. Unless the parties otherwise agree as set forth in section 4 of attached Exhibit A, the Company shall have the right, exercisable from time to time during the term of this Agreement, to sublicense its rights under this Agreement. The Company shall deliver to the University a true, correct, and complete copy of the sublicense agreement or such other agreement under which the Company purports or intends to grant such sublicense rights at least ten (10) days prior to the execution of such agreement. The Company shall not enter into such agreement if the terms of the agreement are inconsistent in any respect with the terms of this Agreement, including without limitation, sections 5.2, 5.4, 6.3, 8.3, 9.5, 10.4, and 11.3 and subsection 6.4.2. The Company shall cause a clause to be included in each sublicense that unconditionally permits the Company to terminate the sublicense, without penalty or expense and without cause, upon no more than sixty (60) days' notice to the sublicensee. The Company shall cause a clause to be included in each sublicense that unconditionally permits the Company, without obtaining the sublicensee's approval and without penalty or expense, to assign all its future rights and obligations under the sublicense to the University. Any sublicense attempted to be made or made in violation of this subsection shall be void and shall constitute an event of default under subsection 8.1.1 of this Agreement.

3.1.3. The Company, without the prior approval of the University, may assign all, but no less than all, its rights and delegate all its duties under this Agreement to another if (i) the Company delivers to the University written notice of the proposed assignment (along with pertinent information about the terms of the assignment and assignee) at least ninety (90) days prior to the effective date of the event described below in part ii of this paragraph, and (ii) the assignment is made as a part of and in connection with (A) the sale by the Company of all or substantially all of its assets to a single purchaser, (B) the sale, transfer, or exchange by the shareholders, partners, or equity owners of the Company of a majority interest in the Company to a single purchaser, or (C) the merger of the Company into another corporation or other business entity. Any

assignment attempted to be made or made in violation of this subsection shall be void and shall, without further act, cause the immediate termination of this Agreement.

3.2. The United States Government's Rights. The University acknowledges in section 1 of attached Exhibit A whether, to its knowledge, the Licensed Technology was funded, in whole or in part, by the federal government of the United States of America. The parties acknowledge and agree that the federal government of the United States of America has certain rights in and to any government-funded Licensed Technology as those rights are described in Chapter 18, Title 35 of the United States Code and accompanying regulations, including Part 401, Chapter 37 of the Code of Federal Regulations; and that the parties' rights and obligations under this Agreement to any government-funded Licensed Technology, including the grant of license set forth above in subsection 3.1.1, are subject to the applicable terms of the aforementioned United States laws.

3.3. The University's Rights. The University retains an irrevocable, nonexclusive right to use the Licensed Technology solely for non-commercial educational, research, and medical purposes and the University shall have the right to sublicense its rights under this section to one or more non-profit academic or other research institutions.

4. **Applications and Patents.**

4.1. Cost Reimbursement. The Company shall pay, or reimburse the University for paying, all reasonable and necessary costs (including attorneys' and application fees) incurred prior to, on, or after the Effective Date to apply for, prosecute, and maintain each Licensed Patent and Patent Application unless otherwise provided in attached Exhibit A. Within thirty (30) days of its receipt of the University's invoice for reimbursable expenses, the Company shall deliver to the University payment in the amount of such invoice. Such invoice shall specify the date on which the expense was incurred and the purpose of the expense (including, as applicable, a summary of patent attorney services giving rise to the expense); provided, however, the University shall have no obligation to disclose to the Company any information that is protected by the University's attorney-client privilege.

4.2. Pre-Agreement Patent Filings. The Company acknowledges that it has reviewed each Licensed Patent and each Patent Application and that it has no basis to challenge or dispute the inventorship, validity, or enforceability of any of the claims made in a Licensed Patent or a Patent Application. The Company further represents that, as of the Effective Date, it has not and does not manufacture, have manufactured, offer to sell, sell, offer to lease, lease, or import (a) any product or good that infringes (including under the doctrine of equivalents) a claim in any Licensed Patent or Patent Application, or (b) any product or good that is made using a process or machine that infringes (including under the doctrine of equivalents) a claim in a Licensed Patent or Patent Application.

4.3. Patent Application Filings during the Term of this Agreement.

4.3.1. The University, in consultation with the Company, shall determine in which countries the University will file, or cause to be filed, a patent application with respect to the Licensed Technology.

4.3.2. In the event the University and the Company mutually agree that the University should file a patent application with respect to the Licensed Technology in a particular country, the University shall retain counsel of its choice to file and prosecute such patent application; the University shall take all commercially reasonable steps to cause a patent application to be filed and a patent to be issued in that country; the University shall inform the Company promptly of the status of the prosecution of the patent application, including delivering to the Company pertinent notices, written and oral communications with governmental officials, and documents, and shall consult with the Company on the prosecution of the patent application; and the Company promptly shall reimburse the University for all the University's out-of-pocket costs, including application and attorneys' fees, to file and prosecute such patent application and, if a patent is issued during the term of this Agreement, to maintain it.

4.3.3. In the event the University and the Company do not reach an agreement as to whether a patent application with respect to the Licensed Technology should be filed in a particular country, the University may, but shall have no duty or obligation hereunder to, file and prosecute such patent application.

4.3.4. No provision of this Agreement limits, conditions, or otherwise affects the University's right to prosecute a patent application with respect to the Licensed Technology in any country. The University retains the sole and exclusive right to file or otherwise prosecute a patent application with respect to the Licensed Technology. In no event shall the Company file a patent application with respect to the Licensed Technology. The Company shall cooperate with the University in the filing and prosecution of all patent applications with respect to the Licensed Technology.

4.4. Maintenance of Licensed Patents. The University shall take all commercially reasonable steps to cause each Licensed Patent to remain or be valid and subsisting.

4.5. Ownership of the Licensed Patents and Patent Applications. No provision of this Agreement grants the Company any rights, titles, or interests (except for the grant of license in subsection 3.1.1 of this Agreement) in the Licensed Patents or Patent Applications, notwithstanding the Company's payment of all or any portion of the patent prosecution, maintenance, and related costs.

5. Commercialization.

5.1. Commercialization and Performance Milestones. The Company shall use its commercially reasonable efforts, consistent with sound and reasonable business practices and judgment, to commercialize the Licensed Technology and to manufacture and offer to sell and

sell Licensed Products as soon as practicable and to maximize sales thereof. Unless excused by the occurrence of an Event of Force Majeure during the term of this Agreement, the Company shall perform, or shall cause to happen or be performed, as the case may be, all the performance milestones described in section 7 of attached Exhibit A. Upon the attainment of all such milestones, the University and the Company shall enter into good faith negotiations with a view towards agreeing upon a new set of performance milestones.

5.2. Covenants Regarding the Manufacture of Licensed Products. The Company hereby covenants and agrees that (i) the manufacture, use, sale, or transfer of Licensed Products shall comply with all applicable federal and state laws, including all federal export laws and regulations; and (ii) no Licensed Product shall be defective in design or manufacture. The Company hereby further covenants and agrees that, pursuant to 35 United States Code Section 205, it shall, and it shall cause each sublicensee, to substantially manufacture in the United States of America all products embodying or produced through the use of an invention that is subject to the rights of the federal government of the United States of America.

5.3. Commercialization Reports. Throughout the term of this Agreement and during the Post-termination Period, and within thirty (30) days of the date specified in the schedule set forth in section 5 of attached Exhibit A, the Company shall deliver to the University written reports of the Company's and the sublicensees' efforts and plans to commercialize the Licensed Technology and to manufacture, offer to sell, or sell Licensed Products.

5.4. Use of the University's Name and Trademarks or the Names of University Faculty, Staff, or Students. No provision of this Agreement grants the Company or sublicensee any right or license to use the name or trademarks of the University or the names, or identities of any member of the faculty, staff, or student body of the University. The Company shall not use and shall not permit a sublicensee to use any such trademarks, names, or identities without the University's and, as the case may be, such member's prior written approval.

6. **Payments, Reimbursements, Reports, and Records.**

6.1. Payments. The Company shall deliver to the University the payment or payments specified in section 6 of attached Schedule A. The Company shall make such payments by check, wire transfer, or any other mutually agreed-upon and generally accepted method of payment. All checks to the University shall be made payable to "Regents of the University of Minnesota" and shall be mailed to the address specified in article 21 of this Agreement. Upon request, the University shall deliver to the Company written wire transfer instructions.

6.2. Reimbursement of Patent Prosecution Expenses. Within thirty (30) days of its receipt of the University's invoice for reimbursable expenses as specified in section 4.1 of this Agreement, the Company shall deliver to the University payment in the amount of such invoice. Such invoice shall specify the date on which the expense was incurred and the purpose of the expense (including, as applicable, a summary of patent attorney services giving rise to the expense); provided, however, the University shall have no obligation to disclose to the Company any information that is protected by the University's attorney-client privilege.

Case 8:12-cv-00404-JVS-AN Document #0-3 Filed 06/08/12 Page 8 of 20 Page ID #:554

6.3. Sales Reports. Within sixty (60) days after the last day of a calendar quarter during the term of this Agreement and the Post-termination Period, the Company shall deliver to the University a written sales report (a copy of the form of which is attached as Exhibit B) recounting the number and Net Sales Price amount (expressed in U. S. dollars) of all sales, leases, or other dispositions of Licensed Products, whether made by the Company or a sublicensee, during such calendar quarter. The Company shall deliver such written report to the University even if the Company is not required hereunder to pay to the University a payment for sales, leases, or other dispositions of Licensed Products during the calendar quarter.

6.4. Records Retention and Audit Rights.

6.4.1. Throughout the term of this Agreement and the Post-termination Period and for five (5) years thereafter, the Company, at its expense, shall keep and maintain and shall cause each sublicensee and each non-affiliated third party that manufactures, sells, leases, or otherwise disposes of Licensed Products on behalf of the Company to keep and maintain complete and accurate records of all sales, leases, and other dispositions of Licensed Products during the term of this Agreement and the Post-termination Period and all other records related to this Agreement.

6.4.2. The University, at its expense except as set forth below in this subsection, shall have the right to inspect and audit the Company's records referred to in subsection 6.4.1 hereof at the Company's address as set forth in article 21 of this Agreement or such other locations as the parties shall mutually agree during the Company's normal business hours. The University shall have the right to determine the Company's compliance with the terms of this Agreement. The Company shall reimburse the University for all its out-of-pocket expenses to inspect and audit such records if the University, in accordance with the results of such inspection and audit, determines that the Company has underpaid amounts owed to the University by at least three percent (3%) or twenty-five thousand and no/100 dollars ($25,000.00), whichever is smaller, in a reporting period. The Company shall cause each sublicensee and each non-affiliated third party that manufactures, sells, leases, or otherwise disposes of Licensed Products on behalf of the Company to grant the University a right to inspect and audit the sublicensee's or third party's records substantially similar to the rights granted the University in this subsection. In connection with, and prior to the commencement of, an audit, if the Company so requests in writing to the University, the Company, the University and the auditor shall enter into an agreement prohibiting the auditor and the University from disclosing the Company's nonpublic, proprietary information to any third party without the Company's prior written consent; provided, however, that consistent with generally accepted auditing standards and the auditor's professional judgment, the auditor may disclose such information to the University and its agents, counsel, or consultants. The Company acknowledges that such an agreement is adequate to protect its legitimate interests, and the parties agree that there shall be no additional nondisclosure agreement demanded as a condition to the commencement of an audit and the University's exercising its rights under this subsection.

6.5. Currency and Checks. All computations and payments made under this Agreement shall be in United States dollars. The exchange rate for the currency into dollars as reported in the *Wall Street Journal* as the New York foreign exchange mid-range rate on the last business day of the month in which the transaction was entered into shall be used for determining the dollar value of transactions conducted in non-United States dollar currencies.

7. Infringement.

7.1. Third-Party Infringement of a Licensed Patent.

7.1.1. Notice of Third Party's Infringement. In the event a party learns of substantial, credible evidence that a third party is making, using, or selling a product in a Field of Use in the Territory that infringes a Licensed Patent, such party promptly thereafter shall deliver written notice of the possible infringement to the other party, describing in detail the information suggesting infringement of the Licensed Patent.

7.1.2. Legal Action to Enforce a Licensed Patent. Upon the delivery of the notice described in subsection 7.1.1 of this Agreement, the Company and the University shall mutually agree upon the steps and acts they shall take to investigate the matter, to cause the third party to cease infringing a Licensed Patent, and to seek compensation for the acts of infringement and reimbursement for related costs and expenses. Either party shall have the right to commence an action to enforce a Licensed Patent. The University shall not have an obligation under this Agreement to commence or maintain such an action. Prior to commencing such an action, the parties shall enter into good faith negotiations on the desirability of bringing suit, the parties to the action, the selection of counsel, and such other matters as the parties shall agree to discuss. No provision of this Agreement shall limit, condition, or otherwise affect a party's statutory and common-law rights to commence an action to enforce a Licensed Patent.

7.2. The Company's Alleged Infringement of a Third Party's Rights.

7.2.1. Notice and Investigation of Alleged Infringement. In the event the Company learns of substantial, credible evidence that its or a sublicensee's manufacture, sale, lease, or other disposition of a Licensed Product potentially or likely infringes the patent rights of a third party, the Company promptly thereafter shall deliver written notice of the possible infringement to the University, describing in detail the information suggesting such infringement. The Company, in consultation with the University, shall engage counsel to investigate the matter and to defend any action commenced by the third party. The Company shall pay the costs of such engagement.

7.2.2. Settlement and Defense. Regardless whether the University or the Company or both are named as parties in an action alleging the Company's infringement of a valid and subsisting patent or other intellectual property right, the University and the Company shall cooperate in the defense of the action. The University and the Company shall mutually agree upon the terms of any settlement of the third party's claims arising out of the manufacture, sale, lease, or other disposition of Licensed Products. In no event

Case 8:12-cv-00404-JVS-AN Document 30-2 Filed 06/08/12 Page 10 of 20 Page ID #:556

shall the Company admit, allege or otherwise state in connection with the defense of a suit described in this subsection orally or in any answer, request for admissions, interrogatories, deposition, affidavit, court testimony, court document (including motion papers and briefs), or any other document of whatever type that a Licensed Patent is invalid or that a claim in a Licensed Patent is invalid, unless the University has given its prior written consent.

7.2.3. Modification of the Terms of this Agreement. In the event the Company's manufacture, sale, lease, or other disposition of Licensed Products is proven by substantial credible evidence to infringe the patent rights of a third party, the University and the Company shall enter into good faith negotiations to modify the payment terms set forth in section 6.1 of this Agreement. As part of such negotiations, the parties may agree to reduce by up to one-half the amount of any running royalty by the amount of any fee or royalty the Company shall be required to pay to license from a third party patent rights necessary and desirable to permit the Company or a sublicensee to manufacture, sell, lease, or otherwise dispose of Licensed Products.

8. Termination.

8.1. By the University.

8.1.1. If the Company breaches or fails to perform one or more of its duties under this Agreement, the University may deliver to the Company a written notice of default. The University may terminate this Agreement by delivering to the Company a written notice of termination if the default has not cured in full within sixty (60) days of the delivery to the Company of the notice of default.

8.1.2. The University may terminate this Agreement by delivering to the Company a written notice of termination at least ten (10) days prior to the date of termination if the Company (i) becomes insolvent; (ii) voluntarily files or has filed against it a petition under applicable bankruptcy or insolvency laws that the Company fails to have released within thirty (30) days after filing; (iii) proposes any dissolution, composition, or financial reorganization with creditors or if a receiver, trustee, custodian, or similar agent is appointed; or (iv) makes a general assignment for the benefit of creditors.

8.2. By the Company. The Company may terminate this Agreement at any time by delivering to the University a written notice of termination at least sixty (60) days prior to the effective date of termination.

8.3. Post-termination Period.

8.3.1. The Company shall not use, or permit others to use, the Licensed Technology or manufacture or have manufactured Licensed Products after the termination or expiration of this Agreement. After the termination of this Agreement under section 8.2 or the expiration of this Agreement, the Company may offer to sell and

sell, offer to lease and lease, and otherwise offer to dispose of or dispose of Licensed Products in the Territory that were manufactured prior to the termination or the expiration of this Agreement. After termination of this Agreement under section 8.1, the Company shall not offer to sell or sell, offer to lease or lease, or otherwise offer to dispose of or dispose of a Licensed Product in the Territory.

8.3.2. Upon termination of this Agreement, for whatever reason, the Company shall grant the University an option to assume, under an assignment, all the Company's future titles, rights, and obligations under the sublicenses granted under this Agreement. The option shall expire sixty (60) days after the date of grant. The University may exercise the option by delivering written notice of exercise to the Company during the exercise period. The University shall have no obligation to pay the Company any amount in consideration for granting or exercising of the option.

Upon termination of this Agreement, for whatever reason, the Company, if requested by the University in a written notice, shall terminate each sublicense granted under this Agreement; shall deliver to the University a true, correct, and complete list identifying each sublicensee and describing the terms of each sublicense, including the royalty rates and other financial terms, milestones, and other material terms; and shall cooperate in the University's efforts to enter into licenses or other forms of agreement with the sublicensees. The Company shall be liable for any costs, expenses, or damages payable to the sublicensee arising out of the termination of a sublicense.

9. **Release, Indemnification, and Insurance.**

9.1. <u>The Company's Release</u>. For itself and its employees, the Company hereby releases the University and its regents, employees, and agents forever from any and all suits, actions, claims, liabilities, demands, damages, losses, or expenses (including reasonable attorneys' and investigative expenses) relating to or arising out of (i) the manufacture, use, lease, sale, or other disposition of a Licensed Product; (ii) the assigning or sublicensing of the Company's rights under this Agreement; or (iii) with the exception of the warranties set forth in sections 10.1 and 10.2 of this Agreement, the University's performance of its obligations hereunder.

9.2. <u>The Company's Indemnification</u>. Throughout the term of this Agreement and thereafter, the Company shall indemnify, defend, and hold the University and its regents, employees, and agents harmless from all suits, actions, claims, liabilities, demands, damages, losses, or expenses (including reasonable attorneys' and investigative expenses), relating to or arising out of the manufacture, use, lease, sale, or other disposition of a Licensed Product, including, without limitation, breach of contract and warranty and products-liability claims relating to a Licensed Product and claims brought by a sublicensee.

9.3. <u>The University's Indemnification</u>. Subject to the limitations on liability set forth in article 11 of this Agreement, throughout the term of this Agreement and thereafter, the University shall indemnify, defend, and hold the Company and its directors, employees, and agents harmless from all suits, actions, claims, liabilities, demands, damages, losses, or expenses

Case 8:12-cv-00404-JVS-AN Document 30-2 Filed 06/08/12 Page 12 of 20 Page ID #:558

(including reasonable attorneys' and investigative expenses) relating to or arising out of the University's breach of the express warranties set forth in sections 10.1 and 10.2 of this Agreement.

9.4. The Company's Insurance.

9.4.1. Throughout the term of this Agreement, or during such period as the parties shall agree in writing, the Company shall maintain, and shall cause each sublicensee to maintain, in full force and effect comprehensive general liability (CGL) insurance, with single claim limits acceptable to the University. Such insurance policy shall include coverage for claims that may be asserted by the University against the Company under section 9.2 of this Agreement and for claims by a third party against the Company or the University arising out of the purchase or use of a Licensed Product. Such insurance policy shall name the University as an additional insured if the University so requests in writing. Such insurance policy shall require the insurer to deliver written notice to the University at the address set forth in article 21 of this Agreement, at least thirty (30) days prior to the termination of the policy. Upon receipt of the University's written request, the Company shall deliver to the University a copy of the certificate of insurance for such policy.

9.4.2. The provisions of subsection 9.4.1 of this Agreement shall not apply if the University agrees in writing to accept the Company's or a sublicensee's, as the case may be, self-insurance plan as adequate insurance.

9.5. Sublicensees - Release. The Company shall cause each sublicensee to grant the University a release from liabilities substantially similar to the release granted in favor of the University in section 9.1 of this Agreement.

10. Warranties.

10.1. Authority. Each party represents and warrants to the other party that it has full corporate power and authority to execute, deliver, and perform this Agreement, and that no other corporate proceedings by such party are necessary to authorize the party's execution or delivery of this Agreement.

10.2. Exclusive Rights. The University warrants that except for the rights of the federal government as described in section 3.2 of this Agreement, to the best of its knowledge, the University owns or has acquired the exclusive rights (including all patent and other intellectual property rights) in the Licensed Technology, Licensed Patent, and Patent Application.

10.3. Disclaimers.

10.3.1. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN SECTIONS 10.1 AND 10.2 OF THIS AGREEMENT, THE UNIVERSITY DISCLAIMS AND EXCLUDES ALL WARRANTIES, EXPRESS AND IMPLIED, CONCERNING THE LICENSED TECHNOLOGY, EACH LICENSED PATENT,

EACH PATENT APPLICATION, AND EACH LICENSED PRODUCT, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF NON-INFRINGEMENT AND THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

10.3.2. The University expressly disclaims any warranties concerning and makes no representations:

(i) that the Patent Applications will be approved or that a patent will issue;

(ii) concerning the validity or scope of any Licensed Patent; or

(iii) that the manufacture, use, sale, lease or other disposition of a Licensed Product will not infringe a third party's patent or violate its intellectual property rights.

10.4. Sublicensees - Warranties. The Company shall cause each sublicensee to give the University warranties and disclaimers and exclusions of warranties substantially similar to the warranty and disclaimers and exclusions of warranties in favor of the University in section 10.1 and subsections 10.3.1 and 10.3.2 of this Agreement.

11. Damages.

11.1. Remedy Limitation. EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, IN NO EVENT SHALL THE UNIVERSITY BE LIABLE FOR (A) PERSONAL INJURY OR PROPERTY DAMAGES OR (B) LOST PROFITS, LOST BUSINESS OPPORTUNITY, INVENTORY LOSS, WORK STOPPAGE, LOST DATA OR ANY OTHER RELIANCE OR EXPECTANCY, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OF ANY KIND.

11.2. Damage Cap. IN NO EVENT SHALL THE UNIVERSITY'S TOTAL LIABILITY FOR THE BREACH OR NONPERFORMANCE OF THIS AGREEMENT EXCEED THE AMOUNT OF PAYMENTS PAID TO THE UNIVERSITY UNDER SECTION 6.1 OF THIS AGREEMENT. THIS LIMITATION SHALL APPLY TO CONTRACT, TORT, AND ANY OTHER CLAIM OF WHATEVER NATURE.

11.3. Sublicensees - Damages. The Company shall cause each sublicensee to agree to limitations of remedies and damages substantially similar to the limitations of remedies and damages set forth in sections 11.1 and 11.2 of this Agreement.

12. Amendment and Waiver. This Agreement may be amended from time to time only by a written instrument signed by the parties. No term or provision of this Agreement shall be waived and no breach excused unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented. No waiver of a breach shall be deemed to be a waiver of a different or subsequent breach.

Case 8:12-cv-00404-JVS-AN Document 30-2 Filed 06/08/12 Page 14 of 20 Page ID #:560

13. **Assignment.** Except as provided in subsections 3.1.2 and 3.1.3 of this Agreement, the Company shall not assign or sublicense its interest or delegate its duties under this Agreement, unless the University consents to the assignment, sublicense, or delegation. Any assignment, sublicense, or delegation attempted to be made in violation of this article shall be void. Absent the consent of all the parties to this Agreement, an assignment or delegation shall not release the assigning or delegating party from its obligations under this Agreement.

This Agreement shall inure to the benefit of the Company and the University and their respective permitted sublicensees and trustees.

14. **Applicable Law.** The internal laws of the state of Minnesota shall govern the validity, construction, and enforceability of this Agreement, without giving effect to the conflict of laws principles thereof.

15. **Access to University Information.** The parties acknowledge that the University is subject to the terms and provisions of the Minnesota Government Data Practices Act, Minnesota Statutes §13.01 *et seq.* (the "Act"), and that the Act requires, with certain exceptions, the University to permit the public to inspect and copy any information that the University shall have collected, created, received, maintained, or disseminated.

To the extent permitted by law, the University shall hold in confidence and disclose only to University employees who need to know the reports described in section 6.3 of this Agreement and the records inspected pursuant to section 6.4 of this Agreement. No provision of this Agreement shall further prohibit, limit, or condition the University's right to use and disclose any information in connection with enforcing this Agreement, in court or elsewhere.

16. **Consent and Approvals.** Except as otherwise expressly provided, all consents or approvals required under the terms of this Agreement shall be in writing and shall not be unreasonably withheld or delayed.

17. **Construction.** The headings preceding and labeling the sections of this Agreement are for the purpose of identification only and shall not in any event be employed or used for the purpose of construction or interpretation of any portion of this Agreement. As used herein and where necessary, the singular shall include the plural and vice versa, and masculine, feminine, and neuter expressions shall be interchangeable.

18. **Enforceability.** If a court of competent jurisdiction adjudges a provision of this Agreement unenforceable, invalid, or void, such determination shall not impair the enforceability of any of the remaining provisions hereof and such provisions shall remain in full force and effect.

19. **Entire Agreement; No Third-Party Beneficiaries.** This Agreement (including all attachments, exhibits, and amendments hereto) is intended by the parties as the final and binding expression of their contract and agreement and as the complete and exclusive statement of the terms thereof. This Agreement cancels, supersedes, and revokes all prior negotiations,

representations and agreements among the parties, whether oral or written, relating to the subject matter of this Agreement.

No provision of this Agreement, express or implied, is intended to confer upon any person other than the parties to this Agreement any rights, remedies, obligations, or liabilities hereunder. No sublicensee shall have a right to enforce or seek damages under this Agreement.

20. **Language and Currency.** Unless otherwise expressly provided in this Agreement, all notices, reports, and other documents and instruments that a party hereto elects or is required by the terms of this Agreement to deliver to the other party hereto shall be in English, and all notices, reports, and other documents and instruments detailing revenues and earned under this Agreement or expenses chargeable to a party hereto shall be United States dollar denominated.

21. **Notices.** All notices, requests, and other communications that a party is required or elects to deliver shall be in writing and shall be delivered personally, or by facsimile or electronic mail (provided such delivery is confirmed), or by a recognized overnight courier service or by United States mail, first-class, certified or registered, postage prepaid, return receipt requested, to the other party at its address set forth below or to such other address as such party may designate by notice given pursuant to this article:

If to the University: Patents and Technology Marketing
University of Minnesota
Attn: Assistant Vice President
450 McNamara Alumni Center
200 Oak Street S.E.
Minneapolis, MN 55455-2070
Facsimile No.: (612) 624-6554
E-mail: ptm@umn.edu

For notices sent pursuant to article 8, with a copy to: University of Minnesota
Office of the General Counsel
Attn: Transactional Law Services Group
360 McNamara Alumni Center
200 Oak Street S.E.
Minneapolis, MN 55455-2006
Facsimile No.: (612) 626-9624
E-mail: contracts@mail.ogc.umn.edu

If to the Company: Imagenetix, Inc.
Attn: William P. Spencer
16935 West Bernardo Drive, Suite 101
San Diego, CA 92127
Facsimile No.: 858-674-8455
E-mail: bill@imagenetix.net

22. **Publicity.** The University reserves the right to disclose to the public the execution and delivery of this Agreement along with the Company's name and the name of the Development.

23. **Relationship of Parties.** In entering into, and performing their duties under, this Agreement, the parties are acting as independent contractors and independent employers. No provision of this Agreement shall create or be construed as creating a partnership, joint venture, or agency relationship between the parties. No party shall have the authority to act for or bind the other party in any respect.

24. **Security Interest.** In no event shall the Company grant, or permit any person to assert or perfect, a security interest in the Company's rights under this Agreement.

25. **Survival.** Immediately upon the termination or expiration of this Agreement, except for certain rights granted for the Post-termination Period described above in section 8.3, all the Company's rights under this Agreement shall terminate; provided, however, the Company's obligations that have accrued prior to the effective date of termination or expiration of this Agreement (e.g., the obligation to report and make payments on sales, leases, or dispositions of Licensed Products and to reimburse the University for costs) and the obligations specified in sections 6.1 and 6.2 of the Agreement shall survive. The obligations and rights set forth in sections 6.4 and 8.3 and articles 9, 10, and 11 of this Agreement shall survive the termination or expiration of this Agreement.

26. **Collection Costs and Attorneys' Fees.** If a party shall fail to perform an obligation or otherwise breaches one or more of the terms of this Agreement, the other party may recover from the non-performing breaching party all its costs (including actual attorneys' and investigative fees) to enforce the terms of this Agreement.

27. **Forum Selection.** A suit, claim, or other action to enforce the terms of this Agreement shall be brought exclusively in the state courts of Hennepin County, Minnesota. The Company hereby submits to the jurisdiction of that court and waives any objections it may have to that court asserting jurisdiction over the Company or its assets and property.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized representatives.

| Regents of the University of Minnesota | Imagenetix, Inc. |
|---|---|
| By: [signature] | By: [signature] |
| Anthony L. Strauss | William P. Spencer |
| Acting Assistant Vice President | President |
| Patents and Technology Marketing | |
| Date: 9-2-05 | Date: 8-23-05 |



Filename - exclusive license final.doc
Document last saved 9/8/05

Shaded Area - Internal University Use Only
PTM Agreement No.: ______
PTM Docket No.(s): Z01153

Exhibit A
Exclusive Patent License Schedule

1. Federal Government Rights (section 3.2):

The University acknowledges that, to the best of its knowledge, the federal government of the United States of America has no rights in or to the Licensed Technology.

2. Patents and Patent Applications (sections 1.4 and 1.7):

(a) Patents issued prior to the date of this Agreement:

U.S. Patent 6,899,892, "Methods to Reduce Body Fat", issued on May 31, 2005.

(b) Patent Applications submitted prior to and pending as of the date of this Agreement:

None.

3. Fields of Use and Territory (subsection 3.1.1):

(a) Fields of Use: All Human Uses

(b) Territory: US

4. Sublicense Rights (subsection 3.1.2):

The Company may sublicense its rights under this Agreement subject to sublicense payments described in provision 6 of this Exhibit A.

5. Commercialization Reports (section 5.3):

Quarterly: Within thirty (30) days after each calendar quarter after the Effective Date of this Agreement, the Company shall deliver to the University the report described in section 5.3 of the Agreement. Such report shall include, when applicable, the protocol and results of pre-clinical and clinical studies.



Filename - exclusive license final.doc
Document last saved 9/8/05

6. Payments (section 6.1):

a. Up-front Payment. The Company shall pay to the University within fourteen (14) days of the Effective Date ten thousand and 00/100 dollars ($10,000) as an up-front payment. This up-front payment shall be non-refundable and not creditable against future royalty obligations.

b. Simple Running Royalty Payments. The Company shall pay to the University within sixty (60) calendar days after the last day of each calendar quarter during the term of this Agreement and the Post-termination Period an amount equal to seven and a half percent (7.5%) of the Net Sales Price of all sales, leases, or dispositions of Licensed Products made by the Company and its sublicensees during such quarter as a running royalty payment.

c. Minimum Annual Royalties: In the event the Simple Running Royalty Payments paid to the University under section 6.1 of the Agreement and section 6(a) of Exhibit A for each whole or partial calendar year during the term of the Agreement (except 2005) do not aggregate a minimum of twenty five thousand US dollars ($25,000), Company, in order to retain the license granted herein, shall pay to the University, within 60 (sixty) calendar days of the end of each calendar year, the difference between the actual Simple Running Royalty Payment for such year and such minimum sum. The minimum royalty payable under this section shall not be prorated or otherwise reduced in the event this Agreement terminates or expires prior to December 31st of a calendar year during the term of this Agreement. The amount payable under section 6(d), sublicense payments, shall not count towards meeting the Minimum Annual Royalty payable under this section 6(c).

d. Sublicense Payments: In addition to payments called for under section 6 of this Exhibit A, the Company shall pay the University twenty-five percent (25%) of all forms of compensation received in connection with granting a third party sublicense rights under this Agreement, including upfront, periodic and milestone payments but excluding running royalty payments as provided in section 6(b) and stock and other forms of equity. The Company shall cause twenty-five percent (25%) of the total number of shares of stock or other forms of equity issued in connection with, and as compensation for, granting a third party sublicense rights under this Agreement to be issued to the University. This payment will be paid to the University within thirty (30) calendar days from the receipt of any such revenue from a Sublicensee. The payments made under this section 6(d) shall not be creditable against the Company's other royalty obligations.

7. Performance Milestones (section 5.1):

By January 30, 2006, First Commercial Sale of a Product.

8. Other Terms:

Patent Cost Reimbursement (section 4.1):

Notwithstanding any term of this Agreement to the contrary, the Company shall have no obligation under this Agreement to pay, or reimburse the University for paying, any cost or expense incurred prior to the Effective Date to apply for, prosecute, or maintain each Licensed Patent or Patent Application.



Filename - exclusive license final.doc
Document last saved 9/8/05

Shaded Area - Internal University Use Only
PTM Agreement No.:__________
PTM Docket No.(s):__________

Exhibit B

Royalty Report Form

Date

** EXAMPLE ONLY **
FORM WILL BE SENT
TO COMPANY EACH PERIOD
FOR COMPLETION

Company Name & Address

License Number __________

Reporting Period: __________ Report Due Date: __________

This report must be submitted regardless of whether royalties are owed.
Please do not leave any column blank. State all information requested below.

| U of M Docket # | Product Description | Royalty Rate | Quantity/ Net Sales | Royalty Due |
|---|---|---|---|---|
| | | | | |

Report Completed by: __________ Total Royalties Due: __________

Telephone Number: __________

If you have questions, please contact: Sharyl Stuber
612-626-4537
lowin001@umn.edu

Please make check payable to: Regents of the University of Minnesota



Filename - exclusive license final.doc
Document last saved 9/8/05

# EXHIBIT "B"

AGREEMENT FOR ASSIGNMENT OF PATENT AND OTHER PROPERTY

The parties to this Agreement (the "Agreement") are IMAGENETIX, INC., a Nevada corporation with its principal place of business at 10845 Rancho Bernardo Road, Suite 105, San Diego, California 92127 ("Imagenetix") and FIRST FRUITS BUSINESS MINISTRY, LLC ("Assignee"), a South Carolina limited liability company having its principal place of business at 213 Leaning Tree Road, Columbia, South Carolina 29223, both collectively referred to herein as the "Parties".

RECITALS

Assignee wishes to acquire all rights to a certain U.S. Patent, United States Patent No. 6,899,892, entitled "Methods to Reduce Body Fat," issued in May 2005 to the Regents of the University of Minnesota ("the UMinn Patent"), and Imagenetix has the right to assign and is willing to assign the UMinn Patent to Assignee, and to acquire other intellectual property ("Additional IP") from Imagenetix. Imagenetix has the right to assign and is willing to assign the UMinn patent and sell related additional IP described below to Assignee.

NOW THEREFORE, in consideration of the foregoing Recitals, and for other good and valuable consideration, the receipt and sufficiency is hereby acknowledged, the parties agree as follows:

1. Purchase of Patent No. 6,899,892

A. The purchase price of the UMinn Patent shall be TWO MILLION DOLLARS ($2,000,000.00) (the "Purchase Price"), of which SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000.00) is non-refundable once those funds are received by the Escrow Agent and may be disbursed by the Escrow Agent to the order of Imagenetix once received. Assignee agrees to wire SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000.00) within two (2) days of this agreement. The remaining ONE MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($1,250,000) will be wired to the escrow account within forty-five (45) days from the execution of this agreement, which is the final payment to purchase the UMinn patent. The funds will be wired to the escrow account of Shustak Frost & Partners, P.C., 401 West A Street, Suite 2330, San Diego, CA 92101, ATT: Erwin J. Shustak, Esq., counsel for Imagenetix ("the Shustak Firm"), per the wiring instructions attached hereto as Exhibit "A". Imagenetix shall receive an initial 30% ownership interest in Assignee pursuant to paragraph 4. Once the TWO MILLION DOLLARS ($2,000,000) has been received, Imagenetix shall also cancel its Exclusive Licensing Agreement with UMinn related to the UMinn Patent No. 6,899,892.

B. Once the Shustak Firm has confirmed receipt of the full Purchase Price of TWO MILLION DOLLARS ($2,000,000.00) in its escrow account, the Shustak Firm shall deliver, within five (5) business days, to Assignee in the form similar to the Assignment of Patent Form attached hereto as Exhibit "B", a complete and unconditional assignment from Imagenetix to Assignee, of all rights in and to United States Patent No. 6,899,892, entitled "Methods to Reduce Body Fat," issued in May 2005 to the Regents of the University of Minnesota ("the UMinn Patent") on the terms and subject to the limitations set forth in this Agreement and the form of Assignment of Patent attached as Exhibit "B". A copy of the UMinn

Patent is attached as Exhibit "C". Once the Shustak Firm has delivered the fully executed Assignment of Patent form to Assignee, to be delivered pursuant to the Notice provisions of paragraph 6, the Shustak Firm may release the remaining balance of the escrowed funds to Imagenetix. In connection with the Assignment of the UMinn Patent to Assignee, Imagenetix represents only that (I) it has or will have the full right and authority to assign the UMinn Patent to Assignee and (ii) it will assign the UMinn Patent free and clear of any and all liens or encumbrances of any kind or nature other than the following: (1) a right reserved by UMinn for a nonexclusive license to use and practice the invention claim in the UMinn Patent for educational and research purposes, as provided in paragraph 1.D. herein, (2) a right reserved by Imagenetix for an exclusive license to market, promote and sell the "UConn Product" (as that term is defined in paragraphs 1.H. and 1.I. herein) which right shall be subject to the limitations set forth in paragraph 1.H. herein, and (3) the outcome of the arbitration pending before JAMS in San Diego, captioned *Imagenetix, Inc., et al.* v. *TriPharma, LLC, et al.*, JAMS Ref. No. 1240020032 (the "Arbitration"), in which TriPharma claims certain rights to the UMinn Patent which Imagenetix disputes. The principals of Assignee and its parents and affiliated companies and their respective counsel have reviewed the pleadings in the Arbitration and all other documents and information they deemed appropriate and have independently determined to proceed with this Agreement despite the pending Arbitration. Imagenetix specifically makes no other warranties or representations of any kind or nature regarding the UMinn Patent and no party to this Agreement is relying on any warranty or representation, oral or written, other than as expressly set forth herein with regard to the UMinn Patent. Imagenetix agrees to provide to Assignee proof that UMinn has assigned the Patent to Imagenetix in the form of a recorded assignment properly filed with the United States Patent Office. If, for any reason, Imagenetix does not or cannot timely deliver the Assignment to Assignee as described in this paragraph B, upon demand, Imagenetix shall promptly deliver to Assignee a full refund of all funds paid by Assignee on account of the purchase of the Patent, together with interest thereon at the prime rate as specified, from time to time, in the Wall Street Journal, from and after the date upon which Assignee has delivered the full TWO MILLION DOLLARS $2,000,000.00) to Escrow Agent.

C. Upon delivery of the UMinn Patent Assignment to Assignee, Imagenetix shall use commercially reasonable efforts to introduce Assignee or its designee to certified research organizations and/or United States universities for purposes of conducting a human clinical trial relating to the UMinn Patent. Imagenetix makes no representation, warranty or guarantee of any kind regarding (i) the number of introductions that Imagenetix will be able to make on behalf of Assignee or its designee or (ii) that any of the parties to whom Imagenetix makes such introductions will actually enter into any agreement with Assignee or its designee regarding any testing or commercial exploitation of the UMinn Patent. Imagenetix agrees only to use reasonable efforts to make as many introductions as it is able to make to third parties with whom Imagenetix has some relationship. If any of the parties to whom Imagenetix makes such introduction agree to undertake a study for Assignee or its designee, it shall be the exclusive obligation of Assignee or designee to pay for any such testing or study.

D. It is expressly understood and agreed that the conveyance of the UMinn Patent is subject to a right reserved by UMinn for a nonexclusive, worldwide, royalty-free, irrevocable license to use and practice the invention claim in the UMinn Patent for educational,

research, and clinical purposes only and that UMinn, in turn, has the right to sublicense that license to other non-profit research institutions and government agencies for educational, research and clinical purposes only, all as set forth on the form of Assignment of Patent attached as Exhibit "B".

E. Upon delivery by Imagenetix (or Escrow Agent) of the Patent Assignment to Assignee, Imagenetix shall not have any obligation to take any steps to maintain the UMinn Patent or pay any fees relative to the prosecution or maintenance of the UMinn Patent and Imagenetix, from and after delivery of the Patent Assignment for the UMinn Patent, shall have no further obligations regarding the UMinn Patent other than as expressly set forth herein.

F. The parties hereto agree and recognize that they met as a result of a contact, initiated by Assignee, to Dr. Robert Hesslink (Imagenetix) and Dr. William Kraemer of the University of Connecticut, which did a study for Imagenetix, and that Dr. Hesslink and Dr. Kraemer, in turn, advised Imagenetix of that contact from Assignee. Imagenetix, in turn, contacted Assignee to find out why it had contacted Dr. Hesslink and Dr. Kraemer. In the course of that discussion, Imagenetix and Assignee discussed the substance of this Agreement. The parties further agree that Imagenetix has not induced Assignee to cancel or breach any contract it may have, if any, with Tripharma, LLC, and Imagenetix, in turn, represents to Assignee that any settlement discussions it has had with Tripharma, relating to the Arbitration, the UMinn Patent or the "Additional IP", as defined herein, have broken down and Imagenetix has ceased all further negotiations with Tripharma.

G. Upon delivery by Imagenetix (or Escrow Agent) of the Patent Assignment to Assignee, Imagenetix thereby immediately and forever shall release Assignee, as well as its affiliates, parents, subsidiaries, successors and assigns, and each of their officers, directors, employees, investors, agents and insurers (hereafter collectively, the "Released Parties"), from any and all legal claims and causes of action arising out of or related to U.S. Patent No. 6,899,892 or any other intellectual property (IP) owned by Imagenetix, including but not limited to clinical studies. The Released Parties shall not include TriPharma or Evan Dameshek or their agents or affiliates, and this Agreement shall not constitute a release or waiver of any rights asserted by Imagenetix in the Arbitration.

H. The Parties acknowledge that Imagenetix utilized the UMinn Patent to create the fat and weight loss product that was the subject of the matched, double-blind, placebo-controlled clinical trial at the University of Connecticut ("the UConn Trial") that is reported in the European Journal of Applied Physiology (2009) 105:665-672. The formula that was the subject of the UConn Trial is referred to herein as the "UConn Formula" and all products containing the UConn Formula are referred to herein as "UConn Product." Upon purchase of the UMinn Patent and/or Imagenetix's additional IP property by Assignee, Assignee hereby grants to Imagenetix a royalty-free, irrevocable license to continue using and practicing the invention claimed in the UMinn Patent and Imagenetix's IP for the limited purpose of manufacturing, marketing, promoting and selling UConn Product in capsule form only via network marketing, multi-level marketing, and direct selling channels only and Imagenetix hereby agrees such license shall remain in effect only until such time as a majority interest in First Fruits Business Ministry, LLC is sold or otherwise conveyed. Assignee shall retain the right to market, promote and sell UConn Product in capsule, tablet, and/or raw material bulk powder form, via any means other than network marketing, multi-level marketing, direct selling channels only until such time

as a majority interest in First Fruits Business Ministry, LLC is sold or otherwise conveyed. For example, and without limitation, Assignee may market and sell UConn Product in capsule form to super markets, convenience stores, mass merchandiser stores, drug stores, and club stores until such time as a majority interest in First Fruits Business Ministry, LLC is sold or otherwise conveyed. Upon purchase of the UMinn Patent, and subject to the royalty payments provided in paragraph 3.C., Assignee shall have all rights in exclusivity as patent owner to manufacture, market and sell UConn Product in beverage form (the "Beverage"). At a mutually agreed upon fair and reasonable price, Imagenetix will be the exclusive supplier of the UCONN Product on a royalty-free basis with any price increases based on an increase in raw materials. In addition, First Fruits Beverage Company, LLC will be the exclusive producer, manufacturer, marketer and distributor of the UCONN Product in beverage form.

I. Upon purchase of the UMinn Patent by Assignee, Assignee hereby grants to Imagenetix an exclusive, worldwide, royalty-free, irrevocable license to use and practice the invention claimed in the UMinn Patent for the purpose of manufacturing, marketing, promoting and selling any UConn Product intended for use by animals only and Imagenetix hereby agrees such license shall remain in effect only until such time as a majority interest in First Fruits Business Ministry, LLC is sold or otherwise conveyed.

2. <u>Purchase Additional Intellectual Property from Imagenetix</u>

A. The purchase price shall be **FIVE HUNDRED THOUSAND DOLLARS ($500,000.00)**. Assignee shall wire to the escrow account of Shustak Frost & Partners within 45 days of the execution of this agreement FIVE HUNDRED THOUSAND DOLLARS ($500,000) for the Intellectual Property as shown below and designated as numbers 1-6. If assignee makes the payment to Imagenetix by wire transfer, Imagenetix will transfer to Assignee the following on forms reasonably acceptable to Assignee within ten (10) business days after the wired funds have been received.

(1) A full description of the ingredients and composition of the formula utilized by Imagenetix to create the fat and weight loss product that was the subject of the matched, double-blind, placebo-controlled clinical trial at the University of Connecticut ("the UConn Trial") that is reported in the European Journal of Applied Physiology (2009) 105:665-672 ("EJAP"). The formula that was the subject of the UConn Trial is referred to herein as "the UConn Formula" and all products containing the UConn Formula are referred to herein as "UConn Product."

(2) All rights Imagenetix may possess to the UConn Trial, whatever those rights may be, and the results of that Trial.

(3) All rights Imagenetix may possess to refer to the EJAP article, a copy of which is attached hereto as Exhibit "D."

(4) All rights Imagenetix possesses to the study conducted in 2008 by the University of Minnesota and Pennington Biomedical Research

Laboratory ("the UMinn Study"). A Microsoft PowerPoint presentation describing the UMinn Study and its results is attached hereto as Exhibit "E."

(5) Any and all rights that Imagenetix may have, if any, to apply for any patent based on the UConn Trial. Imagenetix makes no representation or warranty concerning the likelihood that any such applications will result in patents actually being issued by the United States Patent and Trademark Office and its only undertaking with regard to the rights to be transferred pursuant to this section is to transfer the rights, to the extent there are any; and

(6) Future intellectual property developed by Imagenetix specifically related to the methods to reduce body fat or weight loss using the technology described herein which may include but not be limited to patents, trademark, trademark names, or studies associated with the advancement of this technology, will hereby be transferred to the Assignee.

3. <u>Assignee's Option To Receive Return Of Purchase Price If Imagenetix Is Not The Prevailing Party in Arbitration</u>

A. If Imagenetix is not the "Prevailing Party" in the Arbitration, then Imagenetix shall, at Assignee's option, return the entire amount of the Purchase Price to Assignee, plus interest at the annual rate of 5%, commencing on the original date of delivery of the UMinn Patent to Assignee under paragraph 1.B. Imagenetix shall not be considered the "Prevailing Party" in the Arbitration if the Arbitrator determines that TriPharma owns all or any of the rights under the UMinn Patent transferred hereunder. If Assignee exercises this option by providing Imagenetix written notice thereof, Imagenetix shall make the required payment to Assignee no later than 60 days after the arbitrator's decision is confirmed by a court of competent jurisdiction. Immediately upon Imagenetix' tender of payment under this paragraph, the Parties shall be returned to the status quo, and Imagenetix shall retain full and complete ownership of all intellectual property transferred hereunder. The Parties agree to cooperate, execute, deliver, and file with any government agency, if applicable, any and all documents necessary to effect the purpose of this paragraph.

4. <u>Imagenetix' Initial 30% Ownership Interest In First Fruits Business Ministry, LLC, And Option To Exchange Shares</u>

A. In consideration for a payment of $10 by Imagenetix to Assignee, and for entering into this Agreement, Imagenetix shall own 30% of the initially issued and outstanding membership interests of Assignee (the "Units") and the remaining 70% of the then issued and outstanding Units shall be held as follows: The Roger Catarino Group shall hold 70%. If Imagenetix is not the Prevailing Party in the Arbitration, and Assignee exercises its option under

paragraph 2.A., then immediately upon Imagenetix' tender of payment under paragraph 3.A., the Roger Catarino Group will cause Assignee to invert the Parties' ownership interests in Assignee such that the Roger Catarino Group shall own, in the aggregate, 30% of the then issued and outstanding Units of Assignee and Imagenetix shall own 70% of the Units. Under no circumstances, however, shall Imagenetix be liable for any claims, losses, capital calls, or any other obligations of the Assignee beyond its initial $10 capital contribution to Assignee hereunder without Imagenetix' prior written consent. Assignee agrees, on behalf of its members, to cooperate, execute, deliver, and file with any government agency, if applicable, any and all documents necessary to effect the purpose of this paragraph. Through Shustak Escrow, the First Fruits Business Ministry, LLC will issue a certificate memorializing this feature of the transaction.

B. William Spencer or his designee shall be one of three (3) Managing Members who shall manage the business affairs of the Company through majority approval of the 3-member Managing Board. No additional membership interests shall be created, sold, assigned or conveyed to any other party or parties without the unanimous written consent of Imagenetix and Assignee's remaining Unit holders. Unless Imagenetix expressly consents otherwise in writing, Imagenetix' ownership interest in Assignee shall not be subject to dilution by any means, and therefore all future capitalizations or offerings of Units of Assignee must be structured to accomplish this purpose. The Company's Managing Board shall initially consist of The Roger Catarino, Peter Fawcett, and William Spencer (or his designee).

C. The Parties further intend that Assignee ultimately will License Distribution, Production, Marketing Sales and Advertising rights to the Beverage hereunder to First Fruits Beverage Company, LLC. Subject to paragraph 4.D., commencing on the effective date after the arbitration between TriPharma and Imagenetix is resolved and assignment to First Fruits Beverage Company, LLC of the License rights to the Beverage, Imagenetix shall receive $1.25 for each case, consisting of 24 bottles per case sold worldwide to any purchaser as a royalty separate and apart from the Purchase Payment; and the Roger Catarino Group or his designee(s) shall receive $1.00 per case (collectively, the "Royalty Payments"). Royalty payments of $1.25 and $1.00 respectively will continue until First Fruits Business Ministry, LLC or its designee is sold. Additionally, royalty payments to the FFBM, LLC members, including Imagenetix, will become effective 4-1-2011, but will not be paid until Imagenetix becomes the Prevailing Party in the Tripharma Arbitration as described in Section 4.A. of this Agreement. Once Imagenetix becomes the Prevailing Party in the Arbitration, then accrued royalties shall be paid and future royalties as described in this Agreement shall be paid on a monthly basis to Imagenetix at $1.25 per case sold.

D. The parties intend that as soon as practicable Assignee First Fruits Business Ministry, LLC shall License to First Fruits Beverage Company, LLC the licensing rights referred to in section C above. The Royalty Payments shall therefore be due and owing and paid by First Fruits Beverage Company, LLC. The Royalty Payments due and owing, if any, during the pendency of the Arbitration shall be deposited into separate interest bearing accounts for the benefit of each separate recipient, including, for example, a separate account held solely for the benefit of Imagenetix (the "Accrued Royalties"). Immediately upon receipt by Imagenetix of the Arbitration decision, the Accrued Royalties shall be paid and transferred to Imagenetix and the other recipients, and Royalty Payments thereafter shall be made on a monthly basis. The license from First Fruits Business Ministry, LLC shall be in effect only until such time as a majority

interest in First Fruits Business Ministry, LLC is sold or otherwise conveyed.

5. Insurance Requirement

Assignee shall maintain, and shall cause each licensee, affiliate, contractor, and agent, successor, and assign, to maintain, in full force and effect comprehensive general liability ("CGL") insurance, with single claim limits acceptable to UMinn. Such insurance policy shall include coverage for claims that may be asserted by UMinn against Imagenetix for defense and indemnity, and for claims by a third party against UMinn arising out of the manufacture, purchase or use of licensed products utilizing the Patent. Such insurance policy must (I) name UMinn as an additional insured; and (ii) require the insurer to deliver written notice to UMinn at the address set forth below at least thirty (30) days before the termination of the policy. Upon receipt of the UMinn's written request, Assignee shall deliver to UMinn a copy of the certificate of insurance for such policy.

If to the University:

University of Minnesota
Office for Technology Commercialization
Attn: Contracts Manager
1000 Westgate Drive, Suite 160
St. Paul, MN 55114
Phone: 612.624.0550
Fax: 612.624.6554
E-mail: otcagree@umn.edu

with a copy to:

Office of the General Counsel
Attn: Transactional Law Services
360 McNamara Alumni Center
200 Oak Street S.E.
Minneapolis, MN 55455-2006
Facsimile No.: 612.626.9624
E-mail: contracts@mail.ogc.umn.edu

6. Notices To The Parties

All notices, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been properly given if delivered by hand or by Federal Express or other overnight, commercial courier to Imagenetix or Assignee, as the case may be, at their addresses first above written, or at such other addresses as they may designate by notice given hereunder.

7. Lack of Pending Patent Filings

Imagenetix warrants and represents that it does not now have any patent applications currently filed before the United States Patent and Trademark Office with regard to any product arising out of the UConn Study or the UMinn Patent nor do they currently have any intention to make any such filings but they reserve the right to do so should they decide to in the

future; provided, however, if there are then any pending patent applications or newly filed patent applications, Imagenetix will assign any and all rights to such patent applications to Assignee or its Designee on a no cost basis except Assignee would be responsible for the cost associated with maintaining the new patent.

8. <u>Agreement Binding on Partners, Members, Shareholders, Successors and Assigns</u>

This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective partners, members, shareholders, successors, assigns, and designees.

9. <u>Entire Agreement</u>

This Agreement represents the entire agreement between the parties and supersedes any and all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement and the parties agree that this Agreement cannot be amended or terminated except by written agreement designated as an amendment to this Agreement and signed by the parties hereto.

10. <u>Authority to Sign Agreement</u>

The signatories to this agreement, listed below, hereby represent and warrant that they are authorized by the party on whose behalf they sign, to sign this Agreement and thereby to bind the party to its terms.

11. <u>Cooperation/Further Assurances</u>

The Parties hereto shall cooperate with each other, shall execute such documents and take such other reasonably necessary actions to carry out the purpose and intent of this Agreement, and to assure that the Parties will obtain the contemplated benefit.

12. <u>Miscellaneous</u>

This Agreement may be executed in counterparts, each of which shall be deemed an original, all of which taken together shall constitute the same instrument. A signature made on a faxed or electronically mailed copy of this Agreement or a signature transmitted by facsimile or electronic mail shall have the same effect as the original signature.

This Agreement was the result of negotiations between the Parties and their respective counsel. In the event of vagueness, ambiguity, or uncertainty, this Agreement shall not be construed against the party preparing it but shall be construed as if all Parties prepared the Agreement jointly.

The section headings used in this Agreement are intended solely for convenience or reference only and shall not in any manner amplify, limit, modify, or otherwise be used to define any of the provisions herein.

13. <u>Governing Law</u>

This Agreement shall be governed by the law of the State of California.

14. Arbitration

Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in San Diego County before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. The arbitrator shall, as opposed to may, award the prevailing party all of the costs of the arbitration incurred by that party, including, but not limited to the JAMS administrative, mediator and arbitrator fees, reasonable attorney's fees, costs and disbursements, expert witness fees and other usual and customary costs of arbitration. For purposes of this paragraph, the term "prevailing party" shall be deemed to be the party who has been awarded the majority of the relief sought by that party. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

The Parties agree that they will pay all pre-hearing deposits and fees imposed by JAMS on a *pro rata* basis. In the event a party does not pay their *pro rata* share of the fees and expenses within 30 (thirty) days of the date of the related JAMS invoice, the other party has the option to pay the outstanding fees and expenses, request a default be entered against the party that did not pay their *pro rata* share of the fees and expenses, or request that the arbitrator enter an order of preclusion pursuant to Rule 31(b) of the JAMS Comprehensive Arbitration Rules and Procedures. If the party opts to pay the defaulting party's fees and expenses, then the arbitrator's final Award shall provide that the paying party recover the full amount of the defaulting party's fees and expenses, plus interest at the highest legal rate permitted under California law, regardless of the outcome of the arbitration.

15. Non-Binding Mediation Before Arbitration

Within 10 days from the date of commencement of any arbitration filed pursuant to paragraph 16 above, and prior to the appointment of any arbitrator, the Parties shall submit their dispute to JAMS for non-binding mediation. The Parties will cooperate with JAMS and with one another in selecting a mediator from the JAMS panel of neutrals and in promptly scheduling the mediation proceedings. The Parties covenant that they will participate in the mediation in good faith and that they will share equally in all costs. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the Parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

If the dispute is not resolved within 30 (thirty) days from the date of the submission of the dispute to mediation (or such later date as the Parties may mutually agree in writing), the administration of the arbitration shall proceed forthwith. The mediation may continue, if the Parties so agree, after the appointment of the arbitrator. Unless otherwise agreed by the Parties,

the mediator shall be disqualified from serving as arbitrator in the case. The pendency of a mediation shall not preclude a party from seeking provisional remedies in aid of the arbitration from a court of appropriate jurisdiction, and the Parties agree not to defend against any application for provisional relief on the ground that a mediation is pending.

16. Attorneys Fees and Costs in Case of Dispute

In the event of any dispute between the Parties concerning the meaning or effect of this Agreement, or for the purpose of enforcing or challenging this Agreement, or any term or condition thereof, the prevailing party shall be entitled to recover reasonable attorney's fees and costs incurred in any arbitration or judicial proceeding. For purposes of this paragraph, the term "prevailing party" shall mean the party, if any, that obtained principal relief or result it sought in the proceeding, as shall be determined by the Court or arbitrators.

17. Consent

The Parties warrant they: (1) have read this Agreement, consulted counsel, or have had the opportunity to consult counsel about this Agreement; (2) understand this Agreement and all waivers and responsibilities contained therein; (3) freely and knowingly enter into this Agreement with sound mind and under no fraudulent circumstances and (4) have had the opportunity to investigate the subject matter of this Agreement or have waived their right to do so and are entering into this Agreement without reliance on any representations, written or oral, of any kind other than as specifically set forth herein.

18. Obligations of Escrow Agent

The parties hereto agree and recognize that the firm of Shustak Frost & Partners, P.C. ("Escrow Agent") is counsel to Imagenetix and has agreed to act as such as an accommodation to the parties hereto. The parties agree that Escrow Agent shall have no liability to either party, including Assignee's agents and designee(s), other than for acts of gross negligence or willful misconduct. In the event of any dispute between the parties, Escrow Agent shall be permitted to represent Imagenetix in any such dispute. If Escrow Agent receives conflicting demands regarding the escrowed funds it receives, it shall, at its option, either (I) continue to hold the escrowed funds, in escrow, until such dispute is resolved and it receives written, joint instructions from both parties as to the disposition of the escrowed funds or (ii) it may deposit the escrowed funds into court and initiate an interpleader action at which time it shall have no further liability to any party hereto.

escrowed funds, in escrow, until such dispute is resolved and it receives written, joint instructions from both parties as to the disposition of the escrowed funds or (ii) it may deposit the escrowed funds into court and initiate an interpleader action at which time it shall have no further liability to any party hereto.

SIGNATURES

IN WITNESS WHEREOF, the Parties knowingly and voluntarily sign this Agreement as of the date(s) set forth below:

Dated: 3/4/2011 By: [signature]
Imagenetix, Inc.
William P. Spencer, President

Dated: 3/4/2011 By: [signature]
First Fruits Business Ministry, LLC
Roger Catarino, President

THE FOREGOING PROVISIONS AS THEY RELATE TO OBLIGATIONS AND UNDERTAKINGS OF ESCROW AGENT ARE HEREBY AGREED TO:

Shustak Frost & Partners, P.C.

By: ____________________ Dated: ____________________
Erwin J. Shustak, Esq.
A Member of the Firm



2011-03-04 14:21 8037983338 8037983338 2767832837 p 1/1

**FIRST AMENDMENT TO AGREEMENT FOR ASSIGNMENT OF PATENT AND OTHER PROPERTY**

The parties to this First Amendment (the "Amendment") to that Agreement for Assignment of Patent and Other Property dated as of March 4, 2011 by and between IMAGENETIX, INC., a Nevada corporation with its principal place of business at 10845 Rancho Bernardo Road, Suite 105, San Diego, California 92127 ("Imagenetix"), FIRST FRUITS BUSINESS MINISTRY, LLC ("Assignee"), a South Carolina limited liability company having its principal place of business at 215 Leaning Tree Road, Columbia, South Carolina 29223, collectively referred to herein as the "Parties," (the "Agreement").

**RECITALS**

Assignee wishes to acquire all rights to a certain U.S. Patent, United States Patent No. 6,899,892, entitled "Methods to Reduce Body Fat," issued in May 2005 to the Regents of the University of Minnesota ("the UMINN Patent"). Imagenetix has the right to assign and is willing to assign the UMINN Patent and sell related additional IP to Assignee.

**NOW THEREFORE**, in consideration of the foregoing recitals, and for other valuable consideration, the receipt and sufficiency is hereby acknowledged, the Parties agree to Amend the Agreement on terms and conditions set forth herein. All other terms and conditions in the Agreement remain the same.

1. **Purchase of Patent No. 6,899,892**

A. The purchase price of the UMINN Patent shall be **TWO MILLION DOLLARS ($2,000,000.00)**, of which **ONE MILLION FIVE HUNDRED THOUSAND DOLLARS ($1, 500,000.00)** has been received by the Escrow Agent. From that amount the Escrow Agent was authorized to disburse and did disburse **SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000.00)** to Imagenetix. The remaining **FIVE HUNDRED THOUSAND DOLLARS ($500,000.00)** will be paid to Imagenetix within 120 days from the execution of this Amendment plus interest at the rate of 5% per annum (the "Loan"). Concurrent with the execution of this Amendment, Shusiak Frost & Partners shall transfer the UMINN Patent to Assignee who will execute a security agreement and a UCC-1 which Imagenetix will file with any appropriate government office. Assignee also will execute whatever documents are necessary to perfect a lien of the patent lien of the patent and a security interest with the United States Patent and Trademark Office (Security Interest) using the UMINN Patent as collateral for the Loan until such time the Loan has been paid in full. If the **FIVE HUNDRED THOUSAND DOLLARS ($500,000.00)** is not timely paid Imagenetix shall have the right to pursue all claims against Assignee to collect that sum including, but not limited to, enforcing its rights directly under the Security Agreement to recover the Patent.

B. The parties hereto agree and acknowledge that the Escrow Agent is authorized to release from escrow an additional sum of **SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000.00)** upon receipt of a fully executed copy of this Amendment.

C. Assignee is also granted an extension of 120 days to purchase the additional Intellectual Property as delineated in Section 2 (A) 1-6 in the Agreement. All other items of

Section 2 (A) is to remain the same EXCEPT Imagenetix agrees to transfer the trademark TrimFit® to Assignee concurrent with the execution of this Amendment.

SIGNATURES

IN WITNESS WHEREOF, the Parties knowingly and voluntarily sign this Amendment as of the date(s) set forth below:

Dated: 5-24-11 By: [signature]
Imagenetix, Inc.
William P. Spencer, President

Dated: 5/24/11 By: [signature]
First Fruits Business Ministry, LLC
Roger Catarino, President

# EXHIBIT "C"

First Fruits Business Ministry, LLC

213 Leaning Tree Road

Columbia, SC 29223

(276) 780 – 6781

5/31/13 URGENT!

To: Mr. William Spencer / PRESIDENT & CEO IMAGENETIX

From Roger J. Catarino / CHAIRMAN & CEO FIRST FRUITS BUSINESS MINISTRY, LLC

Re: Immediate Cancellation of Licensing Agreement Related to US Patent # 6,899,892 "METHODS TO REDUCE BODY FAT"

Dear Bill,

Please allow this letter to serve as official notice that The Exclusive Licensing Agreement Imagenetix held, pertaining to US Patent # 6,899,892 "Methods of Reducing Body Fat" has been cancelled, effective immediately. First Fruits Business Ministry, LLC is the owner of the Patent and our company (FFBM, LLC) has been notified of Imagenetix's recent filing of Reorganization (Chapter 11), which constitutes a Breach of the original agreement and triggers our Unfettered Right to cancel.

Our attorneys have uncovered other clauses in the agreement that have also been breached, but because the above mentioned reason (Chapter 11) triggers an immediate Irrevocable cancellation we have chosen not to list them at this time.

First Fruits Business Ministry, LLC appreciates the role Imagenetix played in assisting our company in the purchase of the Patent from The University of Minnesota in March of 2011.

Sincerely,

Roger J. Catarino

Chairman & CEO

FIRST FRUITS BUSINESS MINISTRY, LLC XC: Derik J. Roy III, Esq

# EXHIBIT "D"

Tripharma LLC v. First Fruits Business Ministry LLC et al.
8:12-cv-00404-JVS-AN

Tentative Order Denying Ex Parte Application
for Order Extending Permanent Injunction

Presently before the Court is the Application filed by Plaintiff TriPharma, LLC ("TriPharma"). (Docket No. 276.) Timely opposition to the present Application has been filed by Defendants First Fruits Business Ministry, LLC ("FFBM"), First Fruits Beverage Company LCC ("FF Beverage"), and Roger J. Catarino ("Catarino") (collectively, "Defendants"). (Docket No. 281.) TriPharma filed a timely Reply. (Docket No. 282.)

As set forth below, the Court denies TriPharma's Application.

I. Factual and Procedural Background

The factual and procedural background of this action (and related actions) is extensive and complex, but the underlying dispute is a simple one: A number of parties claim conflicting rights to use certain intellectual property ("the '892 Patent rights"). A summary of certain relevant factual background, including a related case and arbitration award, may be found in the Court's August 21, 2012 Order. (See generally Docket No. 90.) Additional factual background may be found in the Court's April 2, 2013 Order. (See generally Docket No. 213.)

Below, in time line format, the Court briefly summarizes the background relevant to the resolution of the present dispute. Litigation related to former Defendant Imagenetix, Inc. ("Imagenetix") is relevant because Defendants acquired any claim to the rights to exploit the '892 Patent from Imagenetix.

11/02/11 The arbitrator issued the TriPharma-Imagenetix Final Arbitration Award. Relevant to the present dispute, the Final Arbitration Award (referred to by the parties as "Arb. I") found that TriPharma had the "exclusive sublicense to market, sell and distribute any and all products covered by the '892 Patent . . . to the exclusion of all others." (Arb. I Award at 30.) Pursuant to a contractual arrangement between the parties, the arbitrator issued an Injunction prohibiting other parties from exploiting

the '892 Patent. (Id.) The Injunction expressly provided that would expire on October 1, 2014, which was two years after the contractual date upon which the relevant agreement was to expire. (Id.) The arbitrator did so in express reliance upon TriPharma's request, noting that without such an extension, "TriPharma would have a very limited one-year window in which to exploit the benefits of the Agreement." (Id.) The Final Arbitration Award is silent as to TriPharma's '892 Patent rights after October 1, 2014.

08/21/12 The Court entered a Preliminary Injunction, and did so in part based on evidence that Defendants acquired rights to the '892 Patent "subject to" the Final Arbitration Award, which expressly held that TriPharma continued to hold its rights through October 1, 2014. (Docket No. 90 at 21.)

12/17/12 Imagenetix filed for Chapter 11 bankruptcy petition, Case No. 12-16423 MM11 (S.D. Cal.).

04/04/13 Court enters Injunction in this action, mirroring terms set in the Final Arbitration Award, including the October 1, 2014 sunset date. (Docket No. 214 at 2.)

11/04/13 Conditioned upon and effective with the bankruptcy court's approval thereof, TriPharma and Imagenetix entered into a Settlement Agreement, which was intended to settle, *inter alia*, the present action and the arbitration referenced above. (Dameshek Decl. Ex. 2 at 5-6.) The Agreement is expressly intended to become part of the bankruptcy plan, and expressly amends the agreement interpreted in the Final Arbitration Award. (Id. at 6-7.) Part of that amendment includes an acknowledgment by Imagenetix that TriPharma retains an exclusive license to the '892 Patent and that Imagenetix retains no such rights. (Id. Ex. 1 ¶1(a) & (e).) The amendment acknowledges the October 1, 2014 expiration date, but it expressly reaffirms TriPharma's right to renew the exclusive license, which is to occur automatically in the absence of TriPharma's written notice of non-renewal. (Id. ¶ 1(b).)

| | |
|---|---|
| 11/04/13 | The bankruptcy court court confirmed the Settlement Agreement as part of Bankruptcy Plan. (Bankruptcy Court Docket Nos. 268 & 271.) |
| 10/01/14 | Expiration date of Court's Injunction. |
| 10/30/14 | TriPharma filed the present Ex Parte Application seeking extension of the Court's Injunction. (Docket No. 276.) |
| 11/04/14 | Court extended the Injunction pending hearing on the merits of the Ex Parte Application. (Docket No. 278.) |

## II. Discussion

TriPharma contends that it should be granted an extension of the Injunction because "the arbiter failed to take into consideration the automatic five year extension of the agreement," and that the TriPharma-Imagenetix Chapter 11 Settlement Agreement extends TriPharma's rights to the '892 Patent indefinitely. (Application at 6-10.)

The bases upon which TriPharma seeks such relief are not entirely clear. In the Application, TriPharma refers to "changed circumstances" and notes that interlocutory orders may be altered without compliance with the stringent requirements of Federal Rule of Civil Procedure 59(e) or Rule 60(b). (Application at 9.) This argument fails to persuade. The Court's Injunction was issued concurrently with the entry of default judgment as to all remaining Defendants. Thus, the Order TriPharma seeks to amend is not an interlocutory order.

Perhaps recognizing this, in the Reply, TriPharma defends the timeliness of its Application by citing for the first time to the "reasonable time" period in which a party may seek relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(5) & (6). Arguments raised for the first time in the Reply brief are not considered by the Court. See Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). However, even if the Court were to consider TriPharma's request for relief pursuant to Rule 60(b)(5) or (6), the Court would not grant relief because subsection (5) is inapplicable and the present record does not establish "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

In this case, as specified in the record, the Court entered judgment on TriPharma's claims, holding that until October 1, 2014, TriPharma had rights to the '892 Patent that were superior to any rights held by the Defendants, which acquired such rights (if at all) from Imagenetix "subject to" the then-pending TriPharma-Imagenetix arbitration. Neither the arbitrator nor the Court made any determination regarding such rights beyond October 1, 2014.

Today, in substance, TriPharma asks the Court to alter and/or clarify the arbitrator's ruling, and to amend the Court's judgment to effectuate such an alteration and/or clarification. The Court has limited power to alter an arbitration award. Moreover, the present request for relief is in substance an unsupported motion for reconsideration that challenges a final, appealable order of the Court. Such relief is particularly unwarranted in light of TriPharma's failure to pursue the matter on appeal.

Additionally, in substance, TriPharma seeks enforcement of a bankruptcy court order. As has been the case throughout this litigation, TriPharma and Defendants both claim rights to the '892 Patent from the same source: Imagenetix. The arbitration resolved the issue through October 1, 2014. The Settlement Agreement purports to define TriPharma's rights after that date, but if Imagenetix had no rights to convey, any purported transfer to TriPharma was ineffective. Essentially, TriPharma asks the Court to give effect to the Settlement Agreement, which was approved by the bankruptcy court, by declaring that in light of the express terms of the Settlement Agreement TriPharma's rights to the '892 Patent are superior to Defendants' rights. What rights Imagenetix had to the '892 Patent (and whether it had any rights at all) at the time it purported to transfer those rights to TriPharma during the bankruptcy proceedings is not a question properly before the Court in this litigation. It implicates the assets of a bankruptcy estate and the validity of a bankruptcy court order. Moreover, the question is raised after final judgment was entered, and it directly implicates the rights of a party that was dismissed from the present action before an adjudication on the merits.

## III. Conclusion

As set forth above, the post-judgment relief sought by TriPharma is not properly before the Court. Accordingly, the Court denies TriPharma's Ex Parte

Application. The Court's Permanent Injunction and extensions thereof have expired and are no longer in force.

**IT IS SO ORDERED.**

# EXHIBIT "E"

SULLIVAN HILL LEWIN REZ & ENGEL
A Professional Law Corporation
James P. Hill, SBN 90478
Gary B. Rudolph, SBN 101921
Kathryn A. Millerick, SBN 279602
550 West "C" Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4100
Fax Number: (619) 231-4372

**Electronically Filed: 01/09/2017**

Attorneys for Gerald H. Davis, Chapter 7 Trustee

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>IMAGENETIX, INC.,<br><br>Debtor. | CASE NO. 12-16423-MM7<br><br>Chapter 7<br><br>**TRUSTEE'S REPLY TO OPPOSITION TO MOTION FOR ORDER APPROVING STIPULATION REGARDING VESTING OF ASSETS IN THE CHAPTER 7 ESTATE**<br><br>Date: January 19, 2017<br>Time: 10:00 a.m.<br>Dept.: 1<br>Hon. Margaret M. Mann |

**TRUSTEE'S REPLY**

First Fruits Business Ministry, LLC, First Fruits Beverage Company, LLC, and Roger Jake Catarino (collectively "First Fruits") was the only party filing an opposition to the Trustee's Motion for Order Approving Stipulation Regarding Vesting of Assets in a Chapter 7 Estate ("Motion").

The only basis for First Fruits' opposition related to its objection to the transfer of the 892 patent. However, the 892 patent is not property of the estate and is not an asset which is vesting in the Chapter 7 Trustee. Pursuant to the Debtor's Final Report and Account [ECF 593]filed December 20, 2016, on page 14, Schedule A/B-60 the

Debtor listed the ownership of three patents. None of them are patent 892. Additionally, as testified to by Lowell Giffhorn, the Debtor's CFO, at the January 5, 2017, meeting of creditors, the Debtor does not own the 892 patent. See paragraph 2 of the accompanying declaration of Gary B. Rudolph, Esq., filed concurrently herewith.

Therefore, the First Fruits' opposition is moot and there is no opposition to the Motion.

Accordingly, it is respectfully requested that the Motion be granted.

Respectfully submitted.

Dated: January 9, 2017

SULLIVAN HILL LEWIN REZ & ENGEL
A Professional Law Corporation

By: */s/Gary B. Rudolph*
James P. Hill
Gary B. Rudolph
Kathryn Millerick
Attorneys for Gerald H. Davis, Chapter 7 Trustee